IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BOTTOMS UP ENTERPRISES, INC. and )
ISLAND INTERNATIONAL VENTURES, )
LLC, )
            Plaintiffs, )
  )
          v. )  Civil Action No. 07-344
  )
THE BOROUGH OF HOMESTEAD, )
          Defendant. )

<u>MEMORANDUM OPINION</u>

Mitchell, M.J.

    <u>Introduction</u>

      Plaintiffs, Bottoms Up Enterprises, Inc. and Island International Ventures, LLC, bring this action pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1985, for declaratory and injunctive relief with respect to the constitutionality of actions undertaken by the legislative and executive representatives of the Defendant, the Borough of Homestead, restricting adult entertainment establishments through a framework of zoning, licensing and regulatory provisions which, they allege, impose restrictions on their First Amendment protected expression, specifically on adult entertainment businesses.  Plaintiffs allege that Defendant's actions violate their rights under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution as well as Article I, Section 10, which prohibits states from enacting laws impairing the obligation of contracts.

Presently before the Court for disposition is Plaintiffs' Motion for a Preliminary Injunction.  Both parties have submitted briefs and a hearing was held on July 10, July 12, and July 16, 2007, at which testimony and evidence were presented.

<u>Statement of the Case</u>

Bottoms Up Enterprises, Inc., a Pennsylvania corporation, desires to place an "exotic dance club" called "Scores" on East Eighth Avenue in Homestead.  (Compl. ¶ 8.)  This location at issue is zoned C-1, Central Business District.  Restaurants are a permitted use in C-1. However, adult live entertainment facilities and exotic dance clubs with nude performers are prohibited uses in C-1.

Representatives of the Plaintiffs, including their attorney, Luke Lirot, were present at the May 11, 2006 meeting of Homestead Borough Council.  Attorney Lirot made a presentation to Council explaining the specific characteristics of the proposed business.  Attorney Lirot commented at this meeting that, given the language of the existing ordinances, he believed Scores could open on East Eighth Avenue because the dancers would not be totally nude.

Following Attorney Lirot's presentation, in July of 2006, Homestead Borough Council enacted an ordinance (No. 1185) amending the definition of "adult live entertainment facility" to specifically include references to performers wearing g-strings and opaque coverings ("pasties"). Council also enacted another ordinance in July of 2006 (No. 1184), to increase from 500 feet to 1,000 feet the setback required between certain "sensitive uses" and any adult use.

As a result, Plaintiffs could not open their proposed Scores facility in the C-1 zone. Rather, their only option would have been to submit an application to open it in the Waterfront Development District ("WDD"), a commercial zone that contains stores, restaurants and clubs.

However, unlike the C-1 zone, Plaintiffs could not simply open their business in the WDD, but would have to submit an application because the Homestead Code of Ordinances indicated that adult live entertainment was a "conditional" use in the WDD.  They did not do so, but instead initiated this lawsuit.

Facts

Daniel Smithbower is the President and the sole shareholder of Bottoms Up Enterprises, Inc.  (Hr'g Day 1 at 36.)[1]  Smithbower testified that Bottoms Up Enterprises desires to purchase the former bank building located on East Eighth Avenue and to open a Scores restaurant/bar "providing First Amendment protected dance performances."  (Hr'g Day 1 at 26-28.)  He described Scores as a high-end supper club with semi-nude dancing.  (Hr'g Day 1 at 35, 46-48; Pls.' Ex. 1.)

The former bank building is located at 145 East Eighth Avenue in the C-1 zoning district.  (Hr'g Day 1 at 28.)  A daycare center is currently operating on a month-to-month lease in a portion of the building.  Smithbower stated that he intended to assist the daycare center in relocating.  (Hr'g Day 1 at 33-34.)  He further testified that there might be another daycare center in the C-1 zoning district, but that he was not exactly sure.  (Hr'g Day 1 at 39.)  He also acknowledged that people have their residences above some of the businesses along East Eighth Avenue.  (Hr'g Day 1 at 40-41.)

Bottoms Up Enterprises, Inc. had a sales contract with Island International Ventures LLC to purchase the former bank building and later secured an option to purchase this property.  (Hr'g Day 1 at 32-33; Compl. Ex. A.)  However, Smithbower acknowledged that the option to purchase

---

[1]Docket No. 30.

expired on June 15, 2006 and, that while he has been negotiating a further option to purchase, there is no written option to purchase that extends beyond June 15, 2006.  (Hr'g Day 1 at 36-37.) He also acknowledged that at no point in time either before or after May of 2006 did the Plaintiffs apply for a building, occupancy or zoning permit for the former bank building.  (Hr'g Day 1 at 38, 55.)[2]  Smithbower met informally with Marvin Brown, then president of Borough Council, and addressed Brown's concerns about security by proposing to work with the Borough police department.  Brown was satisfied with Smithbower's responses and was in favor of Scores opening.  (Hr'g Day 1 at 22-32, 109-25.)

Smithbower appeared before Borough Council in May of 2006 (along with Attorney Lirot) and gave to Council a written overview/summary of the type of business that Scores is and three volumes of materials showing no adverse secondary effects in regard to adult entertainment uses.  (Hr'g Day 1 at 26-30; Pls.' Ex. 2.)  At the meeting, several Council members indicated their opposition to the project and their desire to hold a vote on it, even though there was no issue then before the Council.  A number of local business people spoke in favor of the project.  (Hr'g Day 1 at 31.)

At the time that Attorney Lirot made a presentation to Homestead Borough Council, the definition of an "adult live entertainment facility" under the Homestead Code was as follows:

> A use including live entertainment involving persons (which may include waiters, waitresses, dancers, clerks, bartenders, contractors or others) displaying uncovered male or female genitals or nude female breasts or engaging in simulated or actual specified sexual activities related to some form of monetary compensation paid to a person, company or organization operating the use or to persons involved in such activity.

---

[2]Attorney Lirot stipulated to this fact at the hearing.  (Hr'g Day 1 at 160.)

(Def.'s Ex. K.)  This definition did not specifically reference g-strings or pasties and thus would have allowed Plaintiffs' proposed facility, because they did not intend for the performers to display complete nudity.[3]

Following Attorney Lirot's presentation, on July 13, 2006, Homestead Borough Council enacted an ordinance (No. 1185) amending the definition of "adult live entertainment facility." The amended definition of "adult live entertainment facility" is as follows:

> A commercial use (including, but not limited to, a use selling food or beverage) featuring or including sexually-oriented live entertainment involving persons (which may include waiters, waitresses, dancers, clerks, bartenders, contractors or others) displaying uncovered male or female genitals or nude female breasts or who are scantily clad so as to be covering the genital area with no more than a g-string or similar opaque covering sufficient to cover only or not much more than the genitals and pubic hair and/or sufficient to opaquely cover only or not much more than the nipples and areolas of a female's breasts.

(Def.'s Ex. C.)

This amended definition specifically references g-strings and pasties.  Council also amended § 260-30 of its Code on July 13, 2006.  Section 260-30 of the Homestead Code that was in effect in May of 2006 provided, among other things, that adult use shall not be located "within 500 lineal feet of the lot line of any primary or secondary school, place of worship, public park, day-care center, child nursery, library, existing dwelling not owned by the same owner as the adult use or any site marked as a proposed future park location on any Borough official map." (Compl. Ex. D, § 260.30(A)(1).)

Under the July of 2006 amendments (Ordinance No. 1184), adult live entertainment facilities now cannot be located "within 1000 lineal feet of a residential district or the lot line" of

---

[3]Plaintiffs contend that Scores would have been classified as a restaurant, a permitted use in the C-1 zone.  (Pls.' Ex. 11, § 260 Attach. 1:3, Table of Permitted Uses.)

the "sensitive uses" cited in the previous version of the ordinance. (Def.'s Ex. T

§ 260.30(A)(1).) As a result, Plaintiffs could not open their proposed Scores facility in the C-1

zone.

Rather, their only option would have been to submit an application to open it in the WDD

zone. The Homestead Code of Ordinances indicated that adult live entertainment was a

"conditional" use in the WDD zone. (Pls.' Ex. 11, § 260 Attach. 1:1, Table of Permitted Uses.)

<u>Procedural History</u>

Plaintiffs filed this action on March 19, 2007. Count I alleges that the legislation violates

their First Amendment right to free expression. Count II alleges that the legislation constitutes a

prior restraint on their First Amendment right to free expression. Count III alleges that the

legislation constitutes an impermissible chilling effect on constitutionally protected speech and

expression, in violation of the First Amendment. Count IV alleges that the legislation denies

them equal protection of the laws and is arbitrary, oppressive and capricious and unreasonably

requires them to submit to controls not imposed on other similarly situated business or

properties, in violation of the Fourteenth Amendment. Count V alleges that the legislation acts

in a way arbitrary and capricious as applied to their proposed business. Count VI alleges that the

legislation constitutes an unlawful exercise of the state's police power in that there is no

substantial relationship to the protection of public health and welfare or any legitimate

governmental objective. Count VII alleges that the legislation violates Plaintiff's right in that it

uses terms vague and indefinite and fails to properly define all phrases set forth therein and fails

to set out distinct criteria. Count VIII alleges that the legislation violates their rights in that it

lacks adequate procedural safeguards. Count IX alleges that the legislation violates their rights in

6

that it manifests an improper purposes because it is not content-neutral and is not unrelated to the suppression of free speech.  Count X alleges that the legislation contains restrictions on First Amendment freedoms that are overbroad and far greater than are essential to the furtherance of any alleged governmental interest.  Count XI alleges that the legislation fails to provide sufficient alternative avenues of communication by impermissibly limiting available locations for adult businesses.  Count XII alleges that the legislation grants unbridled discretion to the administrative officials in the enforcement of its provisions.  Count XIII alleges that the legislation is an unlawful exercise of the state's police power and that the Borough adopted it without competent substantial evidence.  Count XIV alleges that the legislation impaired Plaintiffs' contractual relationship in violation of the First Amendment and Article I, Section 10 of the Constitution.

On April 10, 2007, Plaintiffs filed a motion for preliminary injunction (Docket No. 9). On April 24, 2007, Defendant filed an answer to the complaint and a response to the motion for preliminary injunction (Docket Nos. 11-13).  On May 31, 2007, an order was entered, forwarding the matter to the undersigned to conduct all proceedings through the final determination of the claims set forth in the motion for preliminary injunction (Docket No. 21).

On July 10, July 12, and July 16, 2007, a hearing was held, at which both sides presented testimony and evidence.  Subsequently, post-hearing briefs were filed by both parties.  (Docket Nos. 32, 36.)  The Defendant's post-hearing brief reveals that, on July 25, 2007 (after the hearing concluded but while this matter was under active consideration), a Borough Council meeting was held at which a further amendment to the ordinances at issue was proposed.  (Def.'s Ex. V.)  On September 13, 2007, this amendment was adopted by Borough Council.  See Docket No. 38.

Defendant contends that the proposed amendment (now enacted as Ordinance No. 1196) has rendered moot Plaintiffs' challenges to the conditional use and overbroad aspects of Ordinance Nos. 1184 and 1185.  They also note that Ordinance No. 1196 addresses all of Plaintiffs' contentions that Ordinance Nos. 1184 and 1185 do not allow for adequate alternative avenues of communication, except for the restrictive covenants, which are private agreements to which the Borough is not a party.

On August 16, 2007, Plaintiffs filed a brief in response to the proposed 2007 amendment (Docket No. 37), in which they argue that the Court cannot take notice of the proposed ordinance, but must consider the situation as it existed at the time of the hearing.  They further argue that, even if enacted, the ordinance would change nothing and still result in a "complete zone-out" of adult entertainment in Homestead.

Standard of Review

The four factors which govern the Court's decision whether to issue a preliminary injunction are the following: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the non-moving party; and (4) whether granting the preliminary relief will be in the public interest.  Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999) (citation omitted).

Discussion

Speech, be it in the form of film, live presentations, or printed matter, that is sexually explicit in content but not "obscene" is protected under the First Amendment.  Schad v.

Borough of Mt. Ephraim, 452 U.S. 61, 66 (1981); Phillips v. Borough of Keyport, 107 F.3d 164,

172 (3d Cir. 1997) (en banc).  The Supreme Court has held that "nude dancing ... is expressive

conduct, although we think it falls only within the outer ambit of the First Amendment's

protection."  City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (O'Connor, J.).[4]

      However, not every regulation of protected speech violates the First Amendment; nor is

every form of speech regulation subject to the same degree of scrutiny when challenged in court.

"Exacting" or "strict" scrutiny is applied to regulations that suppress, disadvantage, or impose

differential burdens upon speech because of its content.  Turner Broadcasting Sys., Inc. v.

F.C.C., 512 U.S. 622 (1994).  In contrast, regulations that are unrelated to the content of the

speech are subject to an intermediate level of scrutiny because in most cases they pose a less

substantial risk of excising certain ideas or viewpoints from the public dialogue.

      Regulations that restrict the time, place and manner of expression in order to ameliorate

undesirable secondary effects of sexually explicit expression are regarded as content neutral and

receive "intermediate" rather than "exacting" or "strict" scrutiny.  City of Renton v. Playtime

Theaters, Inc., 475 U.S. 41, 48 (1986) (zoning ordinances designed to combat the undesirable

secondary effects of businesses that purvey sexually explicit materials are to be reviewed under

the standards applicable to "content neutral" time, place and manner regulations).  Reasonable

time, place and manner regulations of protected speech are valid if: (1) they are justified without

reference to the content of the regulated speech; (2) they are narrowly tailored to serve a

---

     [4]Justice O'Connor noted that this view was endorsed by eight members of the Court in
Barnes v. Glen Theater, Inc., a case involving public nudity laws.  501 U.S. 560 (1991).  See id.
at 565-66 (plurality opinion by Chief Justice Rehnquist), 581 (Souter, J., concurring in the
judgment), 587 (White, J., dissenting).

significant or substantial government interest; and (3) they leave open ample alternative channels of communication.  Mitchell v. Commission on Adult Entertainment Establishments, 10 F.3d 123 (3d Cir. 1993).  See Phillips, 107 F.3d at 172.

In City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002), two adult establishments brought suit to challenge a city ordinance that prohibited the establishment or maintenance of more than one such enterprise in the same building.  The district court granted their motion for summary judgment, finding that the ordinance was a content-based regulation of speech that failed strict scrutiny.  The Ninth Circuit affirmed, but on different grounds: it held that, even if the ordinance were content-neutral, the city failed to demonstrate that the prohibition was designed to serve a substantial government interest, thereby rendering it invalid under City of Renton.  Specifically, the Ninth Circuit found that the city failed to present evidence upon which it could reasonably rely to demonstrate a link between multiple-use establishments and negative secondary effects.

The Supreme Court reversed.  A plurality of the Court (Justice O'Connor, joined by Chief Justice Rehnquist and Justices Scalia and Thomas) applied City of Renton and concluded that the zoning ordinance at issue was constitutional because the city could reasonably rely on a 1977 study to demonstrate that its current ban on multiple adult establishments in the same building served its interest in reducing crime.  Id. at 429-43 (plurality opinion).  Justice Kennedy wrote a separate opinion concurring in the judgment.  He agreed with the plurality that the zoning ordinance at issue should be analyzed under City of Renton, but he concurred in the judgment because he believed that "the plurality's application of City of Renton might constitute a subtle expansion, with which [he did] not concur."  Id. at 445 (Kennedy, J., concurring in the

10

judgment).   He concluded that the Court's precedents could allow the city to impose its

regulation in the exercise of the zoning authority and that the city should not have been

foreclosed by summary judgment.   Justice Souter, joined by Justices Stevens and Ginsburg (and,

in part, Justice Breyer), dissented  Id. at 453-66 (Souter, J., dissenting).

"When a fragmented Court decides a case and no single rationale explaining the result

enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken

by those Members who concurred in the judgments on the narrowest grounds."  Marks v. United

States, 430 U.S. 188, 193 (1977) (quotation marks omitted).  Because Justice Kennedy concurred

in the judgment on the narrowest grounds, his opinion represents the Supreme Court's holding in

Alameda Books under Marks.[5]  See World Wide Video of Washington, Inc. v. City of Spokane,

368 F.3d 1186, 1193 (9th Cir. 2004); Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County,

337 F.3d 1251, 1264 (11th Cir. 2003); SOB, Inc. v. County of Benton, 317 F.3d 856, 862 n.1

(8th Cir. 2003); Ben's Bar, Inc. v. Village of Somerset, 316 F.3d 702, 722 (7th Cir. 2003).

Justice Kennedy seemed to challenge the notion that these kinds of ordinances are content

neutral, stating that they "are content based and we should call them so."  535 U.S. at 448

(Kennedy, J., concurring).  However, he went on to conclude that: "A zoning restriction that is

designed to decrease secondary effects and not speech should be subject to intermediate rather

than strict scrutiny."  Id.

The Court in Alameda Book described the process it had followed in City of Renton in

this way:

---

[5]Plaintiffs in this case continually cite to Justice Souter's opinion.  However, Justice
Souter's opinion does not represent the narrowest ground of agreement: his opinion is a dissent.

Our analysis of the ordinance proceeded in three steps.  First, we found that the ordinance did not ban adult theaters altogether, but merely required that they be distanced from certain sensitive locations.  The ordinance was properly analyzed, therefore, as a time, place, and manner regulation.  We next considered whether the ordinance was content neutral or content based.  If the regulation were content based, it would be considered presumptively invalid and subject to strict scrutiny.  We held, however, that the Renton ordinance was aimed not at the content of the films shown at adult theaters, but rather at the secondary effects of such theaters on the surrounding community, namely, at crime rates, property values, and the quality of the city's neighborhoods.  Therefore, the ordinance was deemed content neutral.  Finally, given this finding, we stated that the ordinance would be upheld so long as the city of Renton showed that its ordinance was designed to serve a substantial government interest and that reasonable alternative avenues of communication remained available.  We concluded that Renton had met this burden, and we upheld its ordinance.

Id. at 434 (citations omitted).

In Barnes v. Glen Theater, Inc., 501 U.S. 560 (1991), the Supreme Court indicated that it would analyze public nudity laws following the standard set forth in United States v. O'Brien, 391 U.S. 367 (1968).  The O'Brien Court established a four-prong test to be applied in determining whether a government regulation of conduct violates the First Amendment.  This test considers: 1) whether the regulation is within the constitutional power of the government to enact; 2) whether the regulation furthers an important or substantial government interest; 3) whether the government interest is unrelated to the suppression of free expression; and 4) whether the restriction is no greater than is essential to the furtherance of the government interest.  See City of Erie v. Pap's A.M., 529 U.S. 277 (2000) (holding that an Erie ordinance proscribing nudity in public places was a content-neutral regulation that was valid under the O'Brien test).

The third step of the City of Renton test – whether an ordinance "is designed to serve a substantial government interest" –  and the second step of the O'Brien test – whether the

ordinance "furthers a substantial government interest" – have been described as "virtually indistinguishable."  Peek-A-Boo Lounge, 337 F.3d at 1264.  The Supreme Court's holdings contemplate a three-step burden-shifting process with respect to these steps.  The burden shifting proceeds as follows:

> a city bears the initial burden of producing evidence that it relied upon to reach the conclusion that the ordinance furthers the city's interest in reducing secondary effects.  To that end, a city need not "conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."  Alameda Books, 535 U.S. at 451, 122 S.Ct. 1728 (Kennedy, J., concurring in the judgment) (quoting Renton, 475 U.S. at 51-52, 106 S.Ct. 925); see also id. at 438, 122 S.Ct. 1728 (plurality opinion) ("[A] municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest." (quotation marks omitted)); Pap's A.M., 529 U.S. at 296, 120 S.Ct. 1382 (plurality opinion) (quoting Renton's "reasonably believed to be relevant" language).  Although a municipality "must rely on at least *some* pre-enactment evidence," such evidence can consist of  "a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion."  Peek-A-Boo Lounge, 337 F.3d at 1268; see, e.g., Pap's A.M., 529 U.S. at 300, 120 S.Ct. 1382 (plurality opinion) (finding sufficient that "the city council relied on this Court's opinions detailing the harmful secondary effects caused by [adult] establishments ..., as well as on its own experiences"); Barnes v. Glen Theatre, Inc., 501 U.S. 560, 584, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter, J., concurring in the judgment) (permitting a municipality to rely on prior judicial opinions); Renton, 475 U.S. at 51-52, 106 S.Ct. 925 (holding that the city was entitled to rely on the experiences of other cities and on a judicial opinion).
>
>   Once a city has provided evidence that it reasonably believed to be relevant to its rationale for enacting the ordinance, plaintiffs must be given the opportunity to "cast direct doubt on this rationale," either by demonstrating that the city's evidence does not support its rationale or by furnishing evidence that disputes the city's factual findings.  Peek-A-Boo Lounge, 337 F.3d at 1265 (quoting Alameda Books, 535 U.S. at 438-39, 122 S.Ct. 1728 (plurality opinion)); see, e.g., Pap's A.M., 529 U.S. at 298, 120 S.Ct. 1382 (plurality opinion) (rejecting claim when plaintiff "never challenged the city council's findings or cast any specific doubt on the validity of those findings").  "If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support

for a theory that justifies its ordinance." Alameda Books, 535 U.S. at 439, 122
S.Ct. 1728 (plurality opinion) (citing Pap's A.M., 529 U.S. at 298, 120 S.Ct. 1382
(plurality opinion)).

　　　　Although the burden lies with the municipality, a court "should be careful
not to substitute its own judgment for that of the [municipality,]" and the
municipality's "legislative judgment should be upheld provided that [it] can show
that its judgment is still supported by credible evidence, upon which [it]
reasonably relies." Peek-A-Boo Lounge, 337 F.3d at 1273.

Daytona Grand, Inc. v. City of Daytona Beach, Fla.., 490 F.3d 860, 875-76 (11th Cir. 2007)

(footnote and some citations omitted).

　　　　Evidence of Negative Secondary Effects

　　　　The government's burden at the initial step of the shifting-burden analysis has been

described as very light.  See Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring).  See

also Illusions-Dallas Private Club, Inc. v. Steen, 482 F.3d 299, 313 (5th Cir. 2007); Doctor

John's, Inc. v. City of Roy, 465 F.3d 1150, 1166 (10th Cir. 2006); Zibtluda, LLC v. Gwinnett

County ex rel. board of County Comm'rs, 411 F.3d 1278, 1286-87 (11th Cir. 2005); World Wide

Video, 368 F.3d at 1194; R.V.S., L.L.C. v. City of Rockford, 361 F.3d 402, 411 (7th Cir. 2004).

Plaintiffs concede that the Borough meets its initial burden.  (Docket No. 36 at 23-24.)  However,

they contend that they have presented sufficient evidence to cast doubt on the Borough's

rationale and that the Borough has not met its burden of supplementing the record with evidence

justifying its ordinances.

　　　　Defendant argues that Ordinance Nos. 1184 and 1185 were reasonable time, place and

manner regulations of protected speech.  It maintains that these ordinances were aimed at

combating negative secondary effects caused by the presence of adult live entertainment facilities

and were not directed at suppressing the erotic message, and that they were narrowly tailored and

left the entire WDD zone, the largest or second largest zoning district in Homestead, open for adult live entertainment facilities.

Plaintiffs contend that there was no evidence that the ordinances were aimed at combating negative secondary effects, but rather Council's intent was to preclude Scores from opening anywhere in Homestead.  They further argue that, although the ordinances appeared to leave the WDD available for adult live entertainment facilities, a number of factors (the 1,000-foot setback which was vague as to where the measurement ended, the discretion allowed to the Borough to deny the application for a conditional use and "illusory time limits" for it to do so, restrictive covenants between the owners of the Waterfront) resulted in a "complete zone-out" of live adult entertainment in the Borough.

Post-Enactment Support for Legislation

Plaintiffs argue that the Borough did not indicate that Ordinance Nos. 1184 and 1185 were enacted for the purpose of combating adverse secondary effects.  However, at the hearing, Defendant presented testimony and evidence that this was the legislative purpose for their enactments and now Ordinance No. 1196 has added legislative findings in regard to reports and citing cases addressing secondary effects.

The Supreme Court has never decided whether a municipality can rely on evidence that it did not examine prior to adopting the ordinance at issue.  See Alameda Books, 535 U.S. at 442 (noting that the Court did not need to reach the issue of whether the City of Los Angeles could rely on a study described in another case because the city could not prove that it examined this study before it enacted the ordinance).  However, the Court of Appeals for the Third Circuit has held that a municipality can support its ordinance with a factual basis even if that basis was not

presented to the legislative body prior the enactment of the measure at issue.  The court stated that "we have always found it acceptable for individual legislators to base their judgments on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised."  Phillips, 107 F.3d at 178.

Other courts have criticized this view, noting that it is "difficult to square with Renton, whose very language refers to pre-enactment evidence, as well as with the Supreme Court's most recent treatment of this issue in Alameda Books."  Peek-A-Boo Lounge, 337 F.3d at 1268 (footnote omitted).  See also White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 171 (2d Cir. 2007); Ben's Bar, 316 F.3d at 725; SOB, Inc., 317 F.3d at 862; D.H.L. Associates v. O'Gorman, 199 F.3d 50, 57-58 (1st Cir. 1999); Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 690 (10th Cir. 1998).

In Illusions-Dallas Private Club, Inc. v. Steen, the Court of Appeals for the Fifth Circuit appeared to require contemporaneous evidence of a statute's purpose, but it did not limit such evidence to a legislative record or statutory preamble, and would allow other indicators, including the fact of the statute itself, to support a predominant purpose unrelated to suppressing speech.  The court did not decide whether the district court properly relied solely on a post-enactment assertion of a secondary effects purpose as the basis for applying intermediate scrutiny.  482 F.3d at 310 & n.7.  See also R.V.S., 361 F.3d at 411 & n.6 (allowing city to make a trial record with evidence it may not have considered when it enacted the ordinance).

This Court is bound by the holding in the Phillips decision unless and until the Third Circuit rejects it (in an en banc decision) or the Supreme Court clearly overrules it.  Reading

between the lines of the Court's fractured <u>Alameda Books</u> decision to reach such a conclusion

when the plurality opinion explicitly stated that it was not resolving the issue does not satisfy this

standard.  <u>See, e.g.</u>, <u>Illusions-Dallas</u>, 482 F.3d at 315 ("We do not view the four-justice <u>Pap's</u>

<u>A.M.</u> plurality's invocation of the city council's reliance on judicial opinions as overruling [a

previous Fifth Circuit's] requirement that the State produce some evidence to justify its

substantial interest.")

Thus, the Court can consider both the presentation of testimony at the hearing and the

enactment of Ordinance No. 1196, with its references to legislative purposes and studies showing

negative secondary effects.

<u>Evidence of Negative Secondary Effects</u>

Drew Borcik, a Homestead Borough Council member, has lived in Homestead since

1962.  (Hr'g Day 3 at 5.)[6]  He explained that, when the Plaintiffs came before Council in May of

2006, the definition of "Adult Live Entertainment Facility" under the Homestead ordinance only

included totally nude dancers.  (Hr'g Day 3 at 7.)  After the Plaintiffs made their presentation to

Council, Council became aware that its definition of Adult Live Entertainment Facility did not

include dancers wearing g-strings and pasties and, subsequently, amended its ordinance in July of

2006 to include with this definition dancers wearing g-strings and pasties.  (Hr'g Day 3 at 8.)

The preamble to Ordinance 1185 specifically states that "Whereas the Council of the

Borough of Homestead has determined that the definition provided for the aforementioned term

insufficiently describes the adult live entertainment intended to be covered by the term Adult

Live Entertainment Facility."  (Hr'g Day 3 at 9; Def.'s Ex. C.)  Borcik explained that the

_____

[6]Docket No. 29.

"insufficiency" was that nudity was included in the definition of "Adult Live Entertainment Ordinance" but not g-strings and pasties.  (Hr'g Day 3 at 10.)  After the May 2006 meeting, Council directed the Borough solicitor to amend the ordinance and he drafted it accordingly. (Hr'g Day 3 at 29, 35.)

Borcik stated that he was not concerned about Scores in particular but was concerned that adult entertainment uses be located in the WDD zoning district, and not the C-1 zoning district. (Hr'g Day 3 at 10.)  He explained that apartments, daycare centers, private schools, including an elementary school, and playgrounds are located either in the C-1 zoning district or in close proximity thereto.  That was his concern in regard to adult entertainment uses being located in the C-1 zoning district. (Hr'g Day 3 at 11-12.)

Borcik stated that he "scanned" the materials submitted by Smithbower, but relied on the Borough solicitor to review the material and digest it, although he never confirmed whether that occurred prior to the enactment of the ordinances.  (Hr'g Day 3 at 24-25.)  He first heard of Louis Gentile, the Borough's expert, and his opinion as to secondary effects, during the course of the hearing.  (Hr'g Day 3 at 58.)

Borcik stated that the basis of Council's decision to amend the ordinance in July of 2006 was that the type of business being proposed by the Plaintiffs did not fit in the C-1 zoning district and belonged in the WDD zoning district.  (Hr'g Day 3 at 55.)

Jonathan Stewart, an attorney and Borough Council member for Homestead, also testified on behalf of Homestead.  He has lived in Homestead for 14 years.  (Hr'g Day 3 at 74-76.) Stewart testified that it had always been the legislative intent of Council to have adult entertainment uses in the WDD zoning district.  After Council was made aware at the May of

18

2006 meeting that the language of its ordinance was not explicit enough to cover g-strings and pasties, Council amended its ordinance to include g-strings and pasties within the definition of Adult Live Entertainment Facility and, consequently, to locate all adult entertainment uses in the WDD zoning district.  (Hr'g Day 3 at 77-78.)

Prior to voting on the July of 2006 amendments to Homestead's adult entertainment ordinance, Stewart did some research on his own.  He determined that the owner of Bare Elegance, which markets itself as an upscale gentleman's club in the Strip District of Pittsburgh, was under a federal indictment.  As an attorney, he has represented several local dancers and has been made aware of the types of unreported as well as reported crimes that have occurred in several of these local establishments.  (Hr'g Day 3 at 81.)  In particular, Stewart referred to prostitution, extortion, mismanagement of funds and drug related activity and "other crimes that may be more petty in nature than those that I have just indicated."  (Hr'g Day 3 at 84.)

Stewart testified that there are drug activities in adult entertainment establishments, especially the higher end establishments that attract larger players in the criminal cartel.  He based his opinion on "my general knowledge of the goings on of these types of establishments here in Pittsburgh, based upon my reports from clients who have been charged with these types of crimes, based on my association with businessmen who have represented these clubs, based upon my conversations with an administrator of a facility just like yours that markets itself as a high end adult entertainment facility."  (Hr'g Day 3 at 106-07.)  However, he stated that he had not articulated his personal opinion regarding secondary effects at the public hearing and he recalled no discussion of the ordinance at that meeting.  (Hr'g Day 3 at 112-13.)

Stewart testified that he "would anticipate, though I do not have scientific evidence to prove this," that adult entertainment uses would negatively affect the property values in the C-1 zoning district, particularly with residential locations in that district. Stewart explained that "perception is reality" and that the perception of adult entertainment businesses would drive down the values of property in the vicinity of the adult entertainment business.  (Hr'g Day 3 at 83-84.)

Stewart testified that "there was absolutely no attempt by council at any point to exclude Scores from establishing an operation in Homestead.  It was always the intent to more succinctly codify our ordinances to reflect our intention to prohibit all types of adult entertainment, even those that would entail pasties and g-strings, to the Waterfront Development District."  (Hr'g Day 3 at 86.)  Stewart testified that it was "absolutely correct" that it was his belief and council's belief that they were not prohibiting Scores from opening, but rather directing them to the WDD zoning district.  (Hr'g Day 3 at 114.)  He agreed that Scores could have opened in the C-1 zoning district at the time a presentation was made to Council and that the enactment of the ordinances in July 2006 disallowed it from opening there.  (Hr'g Day 3 at 103.)

Stewart testified that "I don't think I'm a big fan of adult entertainment; but I'm also an officer of the Court, and I've also taken an oath to uphold the Constitution of the United States of America, and I take that seriously; and, therefore, I would never want to place myself in a position of authority to eliminate somebody's free speech rights."  (Hr'g Day 3 at 111.)  Stewart further testified that an area was designated where adult businesses could "set up shop" and that what the owners of the particular area intend on doing with each other really is not within our purview."  (Hr'g Day 3 at 109.)

Marvin Brown personally met with the chiefs of police of Stowe and McKees Rocks, nearby municipalities which have adult businesses, and learned that they posed fewer problems than the bars and that there was no negative impact in those neighborhoods.  Also, he stated that councilman Jack Meyers researched the issue of gentlemen's clubs.  (Hr'g Day 1 at 109-25.). Brown stated that there was no discussion of secondary effects of adult businesses at the public meeting when Ordinance No. 1185 was approved.  (Hr'g Day 1 at 135.)  Nevertheless, he agreed that the concerns of other Council members included Scores being located on East Eighth Avenue as compared to the WDD zoning district (Hr'g Day 1 at 127-28) and keeping adult entertainment in the WDD zoning district (Hr'g Day 1 at 128, 131).

Randy Fisher, a Ph.D. in social psychology, testified on behalf of Plaintiffs.  Part of his curriculum of study was research methodology, the fashion in which to conduct social scientific experiments.  (Hr'g Day 2 at 78.)[7]  He has taught for 36 years at the University of Central Florida and has been awarded grants to study the alleged secondary effects of adult businesses.  (Hr'g Day 2 at 78-79.)

Dr. Fisher testified that the secondary effects doctrine is basically one that suggests that the presence of an adult business or sexually oriented business has certain adverse effects on the community.  Exactly how large that area is varies, but it is usually argued that those effects, if they occur, certainly should be felt within a radius of 500 feet, maybe as far out as 1,000 feet or even 1,500 feet.  (Hr'g Day 2 at 85.)  The most commonly cited adverse effects are increases in crime and decreases in property values in adjoining businesses or nearby businesses or residences.  (Hr'g Day 2 at 85.)

---

[7]Docket No. 31.

Dr. Fisher testified that Ordinance Nos. 1184 and 1185 do not reference any consideration to or incorporation of any specific studies or evidence dealing with secondary effects.  (Hr'g Day 2 at 85-86.)  He had reviewed materials provided by Pittsburgh Coalition Against Pornography, which Defendant supplied (Def.'s Ex. M).  Dr. Fisher testified that some of these articles have marginal relevance to the question of secondary effects, such as the reporting on a drug arrest in an adult establishment.  He testified that from a social scientific point of view these are simply anecdotes that may represent a single data point that may be used in a larger statistical analysis. (Hr'g Day 2 at 87-88.)

He critiqued the studies (Def.'s Ex. N) relied upon by Homestead on a number of grounds.  Among his criticisms of these studies were the following: making generalizations from one kind of adult business to another kind of adult business; generalizing from the adult businesses that were studied to a greater number of adult businesses; failing to take into account, when considering the crime rates before and after the opening of a particular adult business, that most businesses of any type generate some degree of crime; failing to match study and control areas closely enough in regard to number of alcohol serving establishments, total population, age mix, and indices of social disorganization such as single parent households, vacant buildings, and transient population; and relying on surveys that looked at opinions about the issue rather than examining the issue directly with empirical data.  He noted that Dr. Danner has performed a series of studies in Tampa, Florida looking at crime in police grids surrounding adult businesses and concluded that there was no increase in crime following the opening of some adult cabarets. In his own study in Broward County, Florida, Dr. Fisher looked at the crime rates over time in

connection with an establishment that went from being a salsa club to an adult business and found no increase in crime rates.  (Hr'g Day 2 at 85-133.)

Dr. Fisher testified that none of the studies relied upon by Homestead would be appropriate for publication in any learned treatise or any kind of scientific volume dealing with secondary effects.  (Hr'g Day 2 at 132-33.)  However, he acknowledged that in regard to studies conducted in the real world, it is difficult to design studies to take into account the many different factors that contribute to crime, such as economics, demographics and social forces.  (Hr'g Day 2 at 133.)  He also acknowledged that "there is no perfect study" and that it is difficult to match the control group with the study group.  (Hr'g Day 2 at 136-37.)

Dr. Fisher agreed that his studies have been criticized by others, including Dr. Richard McCleary.  (Hr'g Day 2 at 133.)  More specifically, some of Fisher's studies rely on "calls for service," and Dr. McCleary is of the opinion that "calls for service" is not a factor used by criminologists in their current studies.  (Hr'g Day 2 at 134.)

Dr. Fisher does not take issue with the findings of the studies relied upon by Homestead, such as more crimes reported by police departments in the vicinity of adult entertainment establishments as compared to the control group.  He stated that he must "trust the data as accurate."  However, he takes issue with how the findings are interpreted.  (Hr'g Day 2 at 137-38.)

Dr. Fisher testified that McCleary has a Ph.D. in criminology.  He further acknowledged that the Garden Grove study conducted by McCleary was performed by a "well trained person" and is "more sophisticated" than others.  He further acknowledged that the conclusion of McCleary's study was that "comparing temporal crime rates before and after changes in the

23

operation of adult businesses, we find evidence of a public safety hazard" and that "given the serious nature of this public safety hazard, we recommend that no new adult businesses should be allowed to within 1,000 feet of a residence." (Hr'g Day 2 at 139-40.)  Dr. Fisher acknowledged that McCleary is of the opinion that the relationship between crime and sexually oriented businesses has been corroborated empirically.  (Hr'g Day 2 at 144.)

Dr. Fisher performed a study used in the <u>Daytona Grand</u> case on the effects of adult businesses on the need for police services and he concluded that adult businesses had fewer police calls than other establishments.  (Hr'g Day 2 at 123-24.)  However, he acknowledged that the Eleventh Circuit criticized his study and pointed out that some of his results seemed to suggest or support the theory of adverse secondary effects.  He acknowledged that "there were some of our findings that might support the theory of adverse effects."  (Hr'g Day 2 at 145-46.)

Dr. Fisher concluded his testimony by stating that it is his opinion that in the entire universe of studies, not just the studies offered by Homestead in this particular case, there are no methodologically sound studies that clearly establish secondary effects.  (Hr'g Day 2 at 99, 147.)

Louis Gentile, the president of Gentile-Meinert Investigators, Inc., testified on behalf of Homestead.  Between 1972 and 1989, he worked for the Pennsylvania State Police.  During four and a half of these years Gentile worked undercover in the adult industry.  Between 1989 and 1998 Gentile ran the Pennsylvania Bureau of Narcotics for the Office of the Attorney General.  Since 1998, he has run his own private investigation firm.  (Hr'g Day 2 at 159-61.)  While working undercover in the adult industry, the majority of the undercover work involved adult book stores.  However, some of the book stores contained in them dancing booths with live dancers.  (Hr'g Day 2 at 165.)

Gentile referred to 68 Pa. C.S. §5501, which addresses adult oriented establishments and sets forth legislative findings and the intent of the Pennsylvania General Assembly in regard to adult oriented businesses.  Section 68 Pa. C.S. §5501(a)(3) states that "the continued unregulated operation of such adult-oriented establishments ... is and would be detrimental to the general health, safety and welfare of the citizens of this Commonwealth."  (Hr'g Day 2 at 167-68; Def.'s Ex. R.)

Gentile referred to studies which examined the secondary effects associated with adult entertainment businesses.  (Hr'g Day 2 at 170; Def.'s Ex. N.).  Among the studies that he referred to were studies conducted in the City of Los Angeles, Garden Grove (California), Austin, Indianapolis, and Minneapolis.  Gentile testified that generally these studies conclude that there are secondary effects associated with adult oriented business.  With regard to crimes, among the reported secondary effects are prostitution and public indecency.  (Hr'g Day 2 at 171.)

From his police undercover work, Gentile is of the opinion that crimes in regard to adult oriented business are "grossly under-reported."  The reasons are that the owners do not want to draw attention to their establishment and, that if a patron is a victim of a crime, he is reluctant to report the crime because he will have to disclose where he had been.  However, he acknowledged that he did not have empirical data to support this belief.  (Hr'g Day 2 at 171, 189-92.)

In regard to property values, Gentile found that generally the studies indicate that there is a decrease in property values in the vicinity of adult entertainment businesses.  (Hr'g Day 2 at 172.)  Gentile's conclusion is that "there are enough studies done ... collectively to believe that there is a reasonable conclusion that there are negative secondary effects."  (Hr'g Day 2 at 173.)

Based on his education, experience, and review of the studies, Gentile is of the opinion that there would be negative secondary effects associated with Scores on East Eighth Avenue in Homestead and that these effects would be an increase in crime as well as a decrease in property values.  (Hr'g Day 2 at 174.)  He submitted a report to this effect (Def.'s Ex. Q).  Gentile admitted that he personally has an adverse view of adult businesses as most of the encounters he has had with people in the adult entertainment world have been "unsavory characters."  (Hr'g Day 2 at 208.)

Ordinance No. 1196 amends the preamble of Ordinance Nos. 1184 and 1185 to add legislative findings and cite cases,[8] reports of studies,[9] Gentile's report and 68 Pa. C.S. § 5501 to justify the Borough's regulation of adult businesses.  (Def.'s Ex. U at 1-3 & § 1.)

Plaintiffs contend that Dr. Fisher's data is empirically more accurate and persuasive than the studies upon which Gentile and Defendant rely.  Therefore, they argue that they have succeeded in casting doubt on the Borough's rationale and that the Borough has failed to meet its

---

[8]City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004); Alameda Books; Pap's A.M.; City of Renton; Young v. American Mini Theatres, 427 U.S. 50 (1976); Barnes; California v. LaRue, 409 U.S. 109 (1972); New York State Liquor Auth. v. Bellanca, 452 U.S. 714 (1981); World Wide Video; Ben's Bar; Williams v. Morgan, 478 F.3d 1316 (11th Cir. 2007); H&A Land Corp. v. City of Kennedale, 480 F.3d 336 (5th Cir. 2007); Gammoh v. City of La Habra, 395 F.3d 1114 (9th Cir. 2005); DLS, Inc. v. City of Chattanooga, 107 F.3d 403 (6th Cir. 1997) and Daytona Grand.

[9]Austin, Texas – 1986; Indianapolis, Indiana – 1984; Garden Grove, California – 1991; Houston, Texas – 1983, 1997; Phoenix, Arizona – 1979, 1995-98; Chattanooga, Tennessee – 1999-2003; Los Angeles, California – 1977; Whittier, California – 1978; Spokane, Washington – 2001; St. Cloud, Minnesota – 1994; Littleton, Colorado – 2004; Oklahoma City, Oklahoma – 1986; Dallas, Texas – 1997; Kennedale, Texas – 2005; Greensboro, North Carolina – 2003; Amarillo, Texas – 1977; New York, New York Times Square – 1994; Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses in Minnesota – 1989.

burden of supplementing the record with "evidence of equal stature."  This argument has been

rejected by a number of courts.  For example, the Ninth Circuit stated that:

> The Appellants' proffered expert declared that the City's evidence was
> flawed because "systematically collecting police call-for-service information" and
> adhering to the Appellants' suggested methodological standards were "the only
> reliable information" that could have supported the City's concern.  This is simply
> not the law.  "[S]o long as whatever evidence the city relies upon is reasonably
> believed to be relevant to the problem that the city addresses [,]" it is sufficient to
> support the Ordinance.  Renton, 475 U.S. at 51-52, 106 S.Ct. 925.  While we do
> not permit legislative bodies to rely on shoddy data, we also will not specify the
> methodological standards to which their evidence must conform.  See id. at 51,
> 106 S.Ct. 925; see also Alameda Books, 535 U.S. at 451, 122 S.Ct. 1728
> (Kennedy, J., concurring) ("As a general matter, courts should not be in the
> business of second-guessing fact-bound empirical assessments of city planners.").
> The Appellants have failed to create a genuine issue of material fact as to the
> reliability of the collection of evidence upon which the City relied.

Gammoh v. City of La Habra, 395 F.3d 1114, 1126-27 (9th Cir. 2005) (footnote omitted).  As the

Gammoh case notes, Justice Kennedy in Alameda Books did not require the kind of exacting

empirical evidence Plaintiffs contend the Borough failed to present here.  While Justice Souter

arguably may have concluded that a municipality must present evidence of "equal stature" to that

presented by a challenger, his opinion does not constitute a holding of a majority of the Supreme

Court, or even a plurality thereof.  See also Daytona Grand, 490 F.3d at 880 (rejecting the

argument that "either Alameda Books nor Peek-A-Boo Lounge raises the evidentiary bar or

requires a city to justify its ordinances with empirical evidence or scientific studies.").

Plaintiffs further argue that the "timing" of the enactment of Ordinance Nos. 1184 and

1185 (and No. 1196 as well) demonstrates that the Borough was "targeting" Scores to preclude it

from opening in Homestead.  However, neither of the cases it cites supports this argument.

In Avalon Cinema Corp. v. Thompson, 667 F.2d 659, 662-63 & n.9 (8th Cir. 1981), the court held that certain legislation was "content-based" because it was designed to prevent the sale of sex films in Little Rock, Arkansas.  However, as explained above, the Supreme Court has held since that time that zoning regulations concerning adult businesses should be subject to intermediate level scrutiny, whether because they are designated as "content-neutral" or because they are "content-based" but directed at combating negative secondary effects.  See City of Renton, 475 U.S. at 48; Alameda Books, 535 U.S. at 448 (Kennedy, J., concurring).  To the extent that Avalon Cinema holds otherwise, it is no longer good law.

Plaintiffs also cite 754 Orange Avenue, Inc. v. City of West Haven, Conn., 761 F.2d 105, 113 (2d Cir. 1985).  In that case, the court held that a zoning change was directed at the plaintiff when the city deliberately increased the setback provision to 1500 feet after the plaintiff applied for a permit (because it was located less than 1500 feet away from sensitive uses) and created a "zone out."  Moreover, the court noted that the ordinance gave the administrator too much discretion.  In this case, however, Bottoms Up Enterprises did not establish a business anywhere in Homestead and never applied for a permit, the increase in the setback provision did not preclude all adult use in the WDD zoning district (as discussed below) and the challenge to the conditional aspects of the ordinances fails for lack of standing and mootness.

Plaintiffs contend that the Borough was "targeting" them by changing its ordinances after the May 2006 Borough Council meeting at which they announced their plan to open Scores in the C-1 zoning district so that Scores could no longer do so.  Put another way, Homestead was responding to Plaintiffs' attempt to take advantage of a loophole in the Borough's ordinances by proposing to open Scores as a "restaurant" (a permitted use in the C-1 zone) rather than as "adult

live entertainment" (then defined as applying only to performers who were totally nude) by having dancers wear g-strings and pasties.  Despite Plaintiffs' protestations to the contrary, such a response by the Borough is not prohibited.  See, e.g., Alameda Books, 535 U.S. at 431 (adult bookstores owners attempted to take advantage of a loophole in an ordinance prohibiting high concentrations of adult businesses by congregating them in a single building, so city amended the ordinance to prohibit more than one adult business from operating under one roof).  That a municipality may have been closing a loophole in its ordinances in response to a particular adult business's actions does not demonstrate that the municipality was prohibiting speech, rather than controlling the secondary effects of adult businesses.

Plaintiffs cite Abilene Retail #30, Inc. v. Board of Commissioners of Dickinson County, Kansas, 492 F.3d 1164 (10th Cir. 2007), in which the Tenth Circuit addressed the constitutionality of a zoning ordinance that restricted an adult bookstore's location and mode of operation.  The court held that: 1) the ordinance was content neutral; 2) a factual issue existed as to whether cases and studies cited by the board were reasonably believed to be relevant to its interests, such that the ordinance was designed to service the goal of combating secondary effects of adult businesses; and 3) factual issues existed as to whether the ordinance was narrowly tailored to serve governmental interest in combating secondary effects of regulated businesses.

As to the second issue, the board had relied entirely on cases and studies from other locales' experiences.  The court held that, although the board was permitted to do this, the experience elsewhere had to be germane to the measure under consideration and actually relied upon, but it was not.  Rather, the studies focused on urban environments, whereas the store at issue was in a rural area.  Thus, the court found that the board failed to establish a connection

between these studies and the actual business.  The court also noted that the amendment, which increased the setback from 750 to 1200 feet specifically to force this bookstore to move from its location, "targeted application to a single, existing sexually oriented business differs substantially from the impact on speech contemplated in <u>Alameda Books</u>...." <u>Id.</u> at 1178.  Therefore, the court denied the board's motion for summary judgment.

This case is at the preliminary injunction stage of the proceedings, not the summary judgment stage.  The issue before the Court is not whether there are genuine issues of material fact, but whether Plaintiffs have demonstrated a likelihood of success on the merits.  With respect to the significance of the studies, the Borough of Homestead is not a rural area and thus studies from other urban environments are relevant and do provide a connection to actual adult businesses.  In addition, the increase in the setback provision from 500 feet to 1,000 feet did not directly affect Scores, which did not have a business in the WDD zone and had not submitted a zoning, permit or occupancy application to open a business in that area.  Moreover, even considering the setback provision in the WDD zone, the ordinances left Scores with adequate alternatives.  Finally, the effect of Ordinance Nos. 1184 and 1185 was to close a loophole in the previous scheme of land-use regulations in Homestead, as was the case in <u>Alameda Books</u>.

The cases and studies relied upon by Homestead are those that other courts have found sufficient to support ordinances regulating adult businesses.  <u>See, e.g.</u>, <u>World Wide Video</u>, 368 F.3d at 1190 n.4 (citing studies from Garden Grove, Minneapolis, Austin, Indianapolis, Amarillo and Los Angeles); <u>Giovani Carandola, Ltd. v. Fox</u>, 396 F. Supp. 2d 630 (M.D.N.C. 2005) (citing Phoenix, Los Angeles, Minneapolis and Austin studies), <u>aff'd</u>, 470 F.3d 1074 (4th Cir. 2006).  A municipality need not "conduct new studies or produce evidence independent of that already

generated by other cities, so long as whatever evidence the city relies upon is relevant to the problem that the city addresses."  Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring). See also Pap's A.M., 529 U.S. at 300 (finding it sufficient that "the city relied on this Court's opinions detailing the harmful secondary effects caused by [adult] establishments ... as well as on its own experiences"); Barnes, 501 U.S. at 584 (Souter, J., concurring) (permitting a municipality to rely on prior judicial opinions); City of Renton, 465 U.S. at 51-52 (city was entitled to rely on the experiences of other cities and on a judicial opinion).

In addition, as Defendant notes, Plaintiffs rely in part on Dr. Fisher's studies, which have been criticized for various reasons.  See Daytona Grand, 490 F.3d at 882-83 (challenging Dr. Fisher's study that relied on Computer Automated Dispatch data as problematic because many crimes go unreported and do not have corresponding records in the city's CAD data and also because the conclusion – that crimes were not more common in areas with adult businesses – were undermined by the underlying data, which actually showed significantly higher crime rates in three of six areas studied).  See also Gammoh, 395 F.3d at 1126-27; G.M. Enterprises, Inc. v. Town of St. Joseph, Wis., 350 F.3d 631, 639 (7th Cir. 2003); SOB, Inc., 317 F.3d at 863 & n.2 (all rejecting attempts by plaintiffs to use studies based on CAD data to cast direct doubt on ordinances supported by other studies, anecdotes and court cases).

Adequate Alternatives

Plaintiffs argue that Ordinance Nos. 1184 and 1185 did not leave adequate alternative avenues of communication because they created a 1,000-foot setback from sensitive uses, did not define where the measurement should end, and did not exclude the possibility that the trail along the river and the space marked "POSP" on the zoning map might be declared "public parks" and

31

used to preclude all adult use in the WDD zone.  Defendant argues that testimony presented at

the hearing demonstrates that the Borough would measure to the exterior walls of any structure

of an adult entertainment use, that it would not consider the trail or the "POSP" space to be

public parks and that over 50 acres of land are available in the WDD zone in which adult

entertainment may take place.  It further argues that Ordinance No. 1196 codifies these positions

and increases the amount of land available for adult use in the WDD zoning district.

R. Bruce McLaughlin, a government and land use planning consultant, testified on behalf

of the Plaintiffs.  (Hr'g Day 1 at 56-57; Pls.' Ex. 3.)   He familiarized himself with the ordinances

at issue, the conditional use process and the restrictive covenants of the properties in the WDD

zoning district.  (Hr'g Day 1 at 68.)  He examined the question of where adult use might take

place in Homestead using data from Allegheny County's electronic GIS systems superimposed

on a zoning map.  (Hr'g Day 1 at 77-80; Pls.' Ex. 4.)  He testified that the 1,000 lineal feet

distance requirement between adult entertainment uses and "sensitive" uses such as daycare

centers and schools does not specify whether the measurement should be to the property line or

to the building line of the property on which the adult use is located.  Therefore, he concluded

that the amount of land available for adult use cannot be measured with accuracy.  (Hr'g Day 1 at

76-77, 102-03.)

McLaughlin also testified that there is a Pennsylvania Department of Conservation and

Natural Resources (DCNR) publication (Pls.' Ex. 5) that advertises the trail along the river

located in the WDD zoning district as a public use.  (Hr'g Day 1 at 82-83, 85-86.)  He had no

knowledge as to whether the property along the river on which the trail is located belongs to any

governmental body.  (Hr'g Day 1 at 98.)  He was only aware that the DCNR represents that this trail is for public use.

McLaughlin stated that, because the trail is used as a public recreation area, he believes that it must be considered a public park for purposes of the 1,000 foot setback.  (Hr'g Day 1 at 81, 99.)  He testified that, if the trail is considered a public park from which 1,000 feet must be measured, there are no areas available in the WDD zoning district for adult entertainment uses due to the overlapping of radii of uses.  (Hr'g Day 1 at 82, 85-87.)

McLaughlin also testified that the area designated on the official zoning map of Homestead as "POSP Parks Open Space Public Dist." is in his opinion a proposed future park location and, consequently, must be considered in measuring the 1,000-foot setback.  (Hr'g Day 1 at 87-88.)  However, he did does not know who owns this open space.  (Hr'g Day 1 at 99-100.)

McLaughlin testified that, if the open space and trail are not counted as public parks, there would be approximately 19 acres remaining in the WDD zoning district for adult entertainment uses. (Hr'g Day 1 at 95.)  In this 19 acres there is land available and "suitable for some generic commercial use and it is part of the relevant real estate market."  (Hr'g Day 1 at 97.)

David Gilliland, Homestead's engineer and code enforcement officer, testified on behalf of the Borough.  He stated that the total area of Homestead is 365 acres and its population is approximately 3,300.  (Hr'g Day 1 at 160-61.)

Gilliland testified that the area marked "POSP" on the Homestead zoning map is privately owned and that it is not used for any public use.  (Hr'g Day 1 at 165.)  To the best of his knowledge, there is no proposed use for the POSP zoning district.  (Hr'g Day 1 at 165-66.)  He

stated that the designation POSP means "park, open space or public district" and interprets this definition in the disjunctive.  (Hr'g Day 2 at 23.)

Gilliland does not consider the POSP zoning district to be a public park.  He explained that it is closed to the public "because people have been hit by trains that border both sides of that district."  (Hr'g Day 1 at 170.)  Gilliland explained that open space is a distinct use in the POSP zoning district and that he considers the POSP zoning district to be open space.  (Hr'g Day 1 at 169-70.)

Gilliland testified that there is a gravel trail along the river in the WDD zoning district that is located on private property.  Gilliland does not consider the trail along the river to be a public park because it is not publicly owned.  (Hr'g Day 1 at 166.)  He believes that Steel Valley Trail Council, a non-profit organization, has some kind of agreement with the private property owners to use the land along the river as a trail.  (Hr'g Day 2 at 42-43.)

Gilliland testified that, in his opinion neither the POSP nor the trail along the river come within the definition of "public" contained in the Homestead Code of Ordinances, namely "of or pertaining to any building, structure, use or activity belonging to or affecting any duly authorized government body."  (Hr'g Day 1 at 167.)  He stated that the state government assisted in the funding that created the trail by way of a grant.  (Hr'g Day 2 at 11-13.)  But, in his opinion, the funding of the creation of the trail by the state does not bring the trail within Homestead's definition of "public."  (Hr'g Day 2 at 14.)

As the code enforcement officer for Homestead, Gilliland is the Homestead official who would interpret what is a public park.  (Hr'g Day 1 at 171.)  Gilliland testified that, after consulting with the solicitor of Homestead in regard to the interpretation of the word "public" set

34

forth in the Homestead definitions, he would not interpret either the open space or the trail along the river to be within the definition of "public" in the Homestead Code of Ordinances.  (Hr'g Day 2 at 48.)

Gilliland acknowledged that if the trail and open space were considered to be public parks, there would be no space available in the WDD zoning district for adult entertainment uses. (Hr'g Day 2 at 51.)  Computer generated GIS drawings prepared by Gilliland's office and reviewed and sealed by him show that there are approximately 52 acres available in Homestead for adult uses in the WDD zoning district if the trail and open space are not considered disqualifying factors.  (Hr'g Day 2 at 49; Def.'s Ex. I.)  Within the available space, there are at least 30 lots or sites.  (Hr'g Day 1 at 167.)

Gilliland testified that, prior to the July of 2006 Amendment to the zoning ordinances, the Plaintiffs could have operated their proposed business in the C-1 zoning district, but after these amendments, the Plaintiffs could not operate their proposed business in the C-1 zoning district. (Hr'g Day 2 at 51, 58.)  In regard to the issue of where the 1,000 feet measurement ends, Gilliland testified that the Code does not state whether the 1,000 foot setback must be from property line to property line or to building line, but he interprets the "use" to be the building in which the adult use is located.  (Hr'g Day 2 at 59, 62-63.)

Ordinance No. 1196 amends paragraph 260-30(A)(1) of the Code of Ordinances to read as follows:

> (1)    The exterior walls of any structure of such use shall not be located within 500 lineal feet of any residential district or the lot line of any primary school, secondary school, place of worship, day-care center, child nursery, library, existing dwelling not owned by the same owner as the adult use,

public park or lot marked on any official Borough map as a proposed
future park.

(a)    For purposes of this paragraph, the POSP District
       bordering the WDD and trail along the
       Monongahela River within the WDD shall not be a
       public park.

(Def.'s Ex. U § 4.)  Defendant argues that Ordinance No. 1196 moots Plaintiffs' challenge to

Ordinance Nos. 1184 and 1185 with respect to not leaving adequate alternatives.

Mootness

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing

cases or controversies....  This case-or-controversy requirement subsists through all stages of

federal judicial proceedings, trial and appellate...  The parties must continue to have a "personal

stake in the outcome" of the lawsuit...."  Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78

(1990) (citations omitted).

In Lewis, the Supreme Court held that a Commerce Clause-based challenge to Florida

banking statutes was rendered moot by amendments to the law.  Applying principals of

mootness, a number of courts have held that repeal of or substantial amendment to an ordinance

or other law moots an adult business's First Amendment challenge to the enactment.  See

Fantasy Ranch, Inc. v. City of Arlington, Tex., 459 F.3d 546, 564 (5th Cir. 2006) (adult

businesses' challenges to city's buffer zone and stage height requirements, floor demarcation

provisions, tipping provision and licensing provisions rendered moot by city's amendments to

these ordinances); Brandywine, Inc. v. City of Richmond, Ky., 359 F.3d 830, 835-36 (6th Cir.

2004) (adult bookstores' challenge to city's adult business zoning provision rendered moot by

city's repeal of it); D.H.L. Associates, 199 F.3d at 55 (property owner's challenge to adult business zoning law rendered moot by city's repeal of it).

Defendant argues that Plaintiffs have only facial challenges to Ordinance Nos. 1184 and 1185 and not as applied challenges because they never applied for a building, occupancy or zoning permit.  See Odle v. Decatur County, Tenn., 421 F.3d 386, 389 (6th Cir. 2005) ("Plaintiffs, not having applied for a license, present a facial challenge to the Act's licensing scheme.")  See also Blue Moon Entertainment, LLC v. City of Bates City, Mo., 441 F.3d 561, 565 (8th Cir. 2006) (although facial challenges are ordinarily disfavored, when a licensing statute vests unbridled discretion in a government official over whether to permit or deny expressive activity, anyone subject to the law may challenge it facially without having to apply for a license.  Therefore, it contends that nothing prevents the Borough from amending its ordinances during the pendency of this lawsuit and that Plaintiffs cannot continue to raise constitutional challenges to ordinances that are no longer in existence or are substantially altered by legislation.

The general rule under Pennsylvania law is that property owners have no vested right that zoning classifications will remain unchanged, and the fact that an amending ordinance may depreciate the market value of a property does not render it invalid.  However, a property owner who is able to demonstrate that he has obtained a valid building permit under the old zoning ordinance, that he got it in good faith (that is, without "racing" to get it before a proposed change was made in the zoning ordinance), and that in good faith he spent money or incurred liabilities in reliance on this building permit, acquires a vested right and need not conform with the zoning ordinance as changed.  See, e.g., Gulf Oil Corp. v. Township Board of Supervisors of Fairview, 266 A.2d 84 (Pa. 1970) (although the Township had begun long range planning and a

comprehensive plan had been worked out for development of the Township, where Township had taken no action on such plans at time building permit for gasoline service station was obtained by plaintiff which, one week later, took title to the land and paid $50,000.00 purchase price, plaintiff acquired a vested right in the building permit and was entitled to construct gasoline service station, even though zoning ordinance was subsequently changed so as not to permit such use).

In the instant case, the Plaintiffs never applied for and, consequently, were never issued or denied any building, zoning or occupancy permits pertaining to renovating the building on East Eighth Avenue and using it for the purposes of an adult entertainment establishment. Because the Plaintiffs never applied for and were never issued either a building or occupancy permit, they never acquired a vested right to use the property as an adult live entertainment facility or for any other use.

This Court cannot enjoin ordinances that are no longer in effect.  See Diffenderfer v. Central Baptist Church, Inc., 404 U.S. 412, 414 (1972) (noting that the Court had to "review the judgment of the district court in light of [state law] as it now stands, not as it stood when the judgment below was entered" and that when the relief sought was a declaratory judgment as to a statute that had been repealed, the case was moot).  Under the currently existing legislation (Ordinance No. 1196), even more land is available for adult use in the WDD zoning district than was discussed at the hearing with respect to Ordinance No. 1184 (which as indicated below, was sufficient).  Plaintiffs have not even addressed the question of how much land might be available, citing only the effect of the restrictive covenants.  Their challenge to Ordinance No. 1184 as not

providing adequate alternatives has been rendered moot by the enactment of Ordinance No. 1196.

Moreover, even if the Court were to consider whether Ordinance No. 1184 allowed for reasonable alternative avenues of communication, Plaintiffs would not be entitled to relief.  In City of Renton, the Supreme Court found that an ordinance that leaves "more than five percent of the entire land area of Renton open to use as adult theater sites" allowed for reasonable alternative avenues of communication.  475 U.S. at 53.  The theater argued that some of the land in question was already occupied by existing businesses, that practically none of the land was currently for sale or lease and that in general there were no commercially viable adult theater sites within the area left open by the Renton ordinance.  The Supreme Court rejected the argument that these parts of the land were unavailable because the fact that "respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation."  Id. at 54.  Since then, "Courts have generally found the number to be adequate if fewer than a dozen sites, or under 1% of the city acreage, is potentially available."  Dia v. City of Toledo, 937 F. Supp. 673, 678 (N.D. Ohio 1996).

In this case, David Gilliland, the Borough engineer, testified that the total acreage of Homestead is 365 acres and that Ordinance No. 1184 leaves approximately 52 acres of land available in the WDD zoning district for adult entertainment uses.  (Hr'g Day 2 at 49, 161; Def.'s Ex. I.)  This would result in 14% of the total acreage of Homestead being available for adult use.  Even using the figure proposed by Plaintiffs' expert, R. Bruce McLaughlin, there would be 19 acres available, or approximately 5%.  (Hr'g Day 1 at 95.)  The Court need not resolve this

factual dispute, because even accepting the lower figure proposed by Plaintiffs' expert, there is sufficient land available pursuant to <u>City of Renton</u>.

<u>Restrictive Covenants</u>

As noted above, the Supreme Court has held that ordinances such as the ones at issue in this case will be upheld  so long as "reasonable alternative avenues of communication remain[] available."  <u>Alameda Books</u>, 535 U.S. at 434.  Defendant contends that the WDD zone remains available to Plaintiffs to establish their Scores enterprise.  Plaintiffs respond that the restrictive covenants recorded by the private owners of the Waterfront preclude them from opening a Scores facility there.

At the hearing, James Padjune, a self-employed title abstractor, identified the Declaration of Covenants, Conditions and Restrictions for the Waterfront dated December 7, 1998.  (Pls.' Ex 13.)  These declarations provide for a river walk park along the river that could be transferred to either a "governmental entity or a non-profit entity provided the transferee agrees to assume all cost of improving and maintaining the river walk park after the transfer."  (Hr'g Day 2 at 65, 68.) He described the park easement is depicted adjacent to and follows the contour of the Monongahela River and that public access is depicted on the recorded parcel maps.  (Hr'g Day 2 at 70-74.)

The Waterfront Partners, LLC, an Ohio limited liability company that owned the properties in the WDD zoning district in December of 1998, was the party responsible for recording this declaration.  This Declaration is recorded at Deed Book Volume 10362, Page 210 et seq., in the Recorder of Deeds Office of Allegheny County.   Article 5 (Use Restrictions), Section 5.1.2 provides that "No portion of the Property may be used for an Adult Entertainment

Establishment, regardless of whether the same is permitted under the applicable zoning laws of one or more of the Municipalities."  The phrase "Adult Entertainment Establishment" is defined in Section 1.1.1 as follows:

> any theater, magazine shop, bookstore or other establishment which at any time displays motion pictures, video tapes, books, magazines and/or forms of live entertainment of a graphic sexual nature or content, including, but not limited to, the display of any motion picture, video tape, book, magazine, dancing or any other form of live "entertainment" which: i) is "X-rated" ii) has been prohibited from being presented and/or sold, based on prior presentations and/or sales in one or more localities, because it has been judged to be pornographic or obscene; and/or iii) depicts any live or simulated sex act, and/or includes exposed male or female genitalia in an aroused state.

(Def.'s Ex. B; Pls.' Ex. 13.)  Padjune stated that this restrictive covenant would apply to all parcels subsequently conveyed out even though a deed description, such as that in the GAI Consultants, Inc. deed, describes the lot dimension to the harborline or low water mark.  (Hr'g Day 2 at 73-74; Def.'s Ex. J.)

All of the witnesses at the hearing testified that Homestead is not a party to this declaration, that it is between private landowners and that there was no evidence that the members of Homestead Borough Council were even aware of its existence.  Daniel Smithbower acknowledged that the use restrictions set forth in the declaration were imposed by a private developer.  (Hr'g Day 1 at 43.)  Marvin Brown testified that he was not aware of the restrictive covenants until the present lawsuit.  (Hr'g Day 1 at 123-25.)  David Gilliland testified that it is not his responsibility to be aware of restrictive covenants between private landowners and that restrictive covenants would not come into play in his decision to approve or not to approve an adult entertainment use in the WDD zoning district.  (Hr'g Day 2 at 7.)  He knew of no meetings between Homestead officials and the owners of the WDD properties pertaining to the restrictive

covenants.  (Hr'g Day 2 at 8.)  Neither Drew Borcik nor Jonathan Stewart had any knowledge of

the restrictive covenant prior to the preliminary injunction proceeding, nor (to Stewart's

knowledge) did any other members of the Homestead Planning Commission, of which Stewart is

a member.  (Hr'g Day 3 at 10, 12, 107-08.)  Borcik also testified that the original ordinances

placing adult entertainment uses in the WDD zoning district were enacted in May of 1997, and

that the Declarations of the private developer are dated December of 1998, a year and a half after

the Homestead ordinances.  (Hr'g Day 3 at 20, 70.)

Defendant also contends that the restrictive covenant may not apply to Scores in any

event.  At the hearing, Daniel Smithbower was asked about this definition as it might apply to

Scores.  His testimony was as follows:

> Q.    Now, would you consider the Scores to be X-rated?
>
> A.    No.
>
> Q.    Would you consider the Scores – has Scores ever been prohibited from being presented in any other jurisdiction?
>
> A.    Not that I am aware.
>
> Q.    Based on content?
>
> A.    Not that I am aware.
>
> Q.    And did Scores depict any live or simulated sex act or expose male or female genitals in their aroused state?
>
> A.    No, but when it says live entertainment, we're –
>
> Q.    Okay.  It says, it defines live entertainment as those three things which I just read in that use restrictions, X-rated, it's been banned elsewhere, or genitalia in an aroused state.  Is that correct?
>
> A.    Yes.

> Q.  Would that use restriction made by a private person, as you interpret it, even apply to somebody likes Scores?
>
> A.  Yes, it would, because they have got free rei[]n to interpret this. As soon as you say simulated, anything falls under simulated.

(Hr'g Day 1 at 43-44.)  In other words, Smithbower acknowledged that two of the three definitions would not apply to Scores under any circumstances and that the third did not apply, in his opinion, although he felt that it was open-ended enough to be interpreted to apply to Scores.[10]

During his testimony, Plaintiffs' expert R. Bruce McLaughlin stated that he believed that the restrictive covenant precluded any adult uses within the WDD zone.  However, he acknowledged that he did not know whether the wording of the restrictive covenant was even applicable to the Plaintiffs' proposed use.  (Hr'g Day 1 at 82-84, 90.)

Ordinance No. 1196 states that "whenever the regulations of this subsection are at variance with any other lawfully adopted rules, regulations, ordinances, deed restrictions or covenants, the regulations of this subsection shall prevail."  (Def.'s Ex. U § 8.)  This provision supports the Borough's contention that its intention is not to eliminate adult entertainment, but to limit it to the WDD zone.  However, Defendant has not argued or cited authority to demonstrate that such a provision in an ordinance would be sufficient to overcome privately agreed-upon restrictive covenants that conflicted with it.  For purposes of this case, the Court assumes that a court would enforce the restrictive covenants to preclude adult use in the WDD zone as defined in the covenants (which might not even apply to Scores, for the reasons cited above).

---

[10]Defendant notes that Ordinance No. 1184 also prohibits "live, actual or simulated sex acts" (Def.'s Ex. T § 260-30(A)(13)) and that Plaintiffs have never challenged this provision or indicated that they could not abide by this section of the ordinance.

There is a split of authority on the issue of whether "reasonable alternatives" can include land that, although apparently available for commercial uses, is specifically not available for use as an adult business because of privately agreed-upon restrictive covenants.  The Supreme Court held in City of Renton that a municipality may not "effectively deny a reasonable opportunity to open and operate an adult business."  475 U.S. at 54.  Some courts have suggested, primarily in dicta, that land with restrictive covenants precluding adult use is not a "reasonable alternative."  See D.H.L. Assocs., 199 F.3d at 60 n.6 (noting that, had the owner relied on restrictive covenants, the case would have had a different outcome); Woodall v. City of El Paso, 49 F.3d 1120, 1127 (5th Cir. 1995) (noting that the record suggested "only three situations in which the evidence might support an inference that a specific site and its surrounding area were physically or legally unavailable [including that] three sites and their surrounding areas may have been subject to reciprocal easements barring adult businesses," but "the Ordinances still left a sufficient area physically and legally available for at least forty adult businesses to operate");[11] Lakeland Lounge of Jackson, Inc. v. City of Jackson, Miss., 973 F.2d 1255, 1263 (5th Cir. 1992) (Politz, C.J., dissenting) (noting that the city had originally argued that 1,043 acres were available but retreated from this position when faced with evidence regarding a restrictive covenant on 163 acres); T & A's, Inc. v. Town Bd. of Town of Ramapo, 109 F. Supp. 2d 161, 169 (S.D.N.Y. 2000) (excluding a lot with a restricted covenant on it from the list of available alternatives).

---

[11]In an earlier opinion, the court referred to a restrictive covenant as a "legal characteristic that exclude[s] adult businesses."  Woodall v. City of El Paso, 959 F.2d 1305, 1306 (5th Cir. 1992).

However, other courts have explicitly held that restrictive covenants, to which the municipality is not a party, are not relevant to the analysis.  In Lim v. City of Long Beach, the Ninth Circuit, citing its prior case of Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1531-32 (9th Cir. 1993), listed five considerations for a court to examine, one of which is the reasonableness of using land for "some generic enterprise although not every particular enterprise," and concluded that the fact that adult use apparently cannot take place on the land because of restrictive covenants is irrelevant.  217 F.3d 1050, 1055 (9th Cir. 2000).  See also Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County, 256 F. Supp. 2d 385, 396 (D. Md. 2003) ("local governments are under no obligation either to dictate that third parties make their land available to adult entertainment establishments or even to consider whether restrictive covenants or leases exist among third parties rendering a site unavailable."); Centerfold Club, Inc. v. City of St. Petersburg, 969 F. Supp. 1288, 1302 (M.D. Fla. 1997) ("Municipal or local governments are under no obligation either to dictate that third parties make their land available to adult establishments or to consider whether such private restrictions in fact exist.")

The Eleventh Circuit has noted that:

the First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated for adult use by the zoning ordinance.  It is of no import under Renton that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult business.

David Vincent, Inc. v. Broward County, Fla., 200 F.3d 1325, 1335 (11th Cir. 2000).  The court concluded that the district court did not commit error by finding seven out of nine sites available for adult use in Broward County, but the court's decision, which mentions that restrictive

covenants may forbid operation of adult businesses on one parcel, does not clarify whether or not that parcel was one of the seven.  However, the court has subsequently held that it was "irrelevant for our purposes that all of the land ... is owned by a single private landowner who may be reluctant or unwilling to develop or sell the land." Daytona Grand, 490 F.3d at 871. Given this statement, it is a fair inference that the court would also consider it irrelevant that the land was subject to a restrictive covenant that might preclude adult businesses.

Having reviewed the case law, the Court predicts that, if presented with this issue, the Court of Appeals for the Third Circuit would join the majority of other courts and conclude that the existence of privately agreed-upon restrictive covenants that preclude adult use on land that is otherwise available for commercial use does not demonstrate that a municipality has failed to provide "reasonable alternatives."  In this case, the evidence is uncontroverted that the restrictive covenants were recorded after the first adult business ordinance was enacted, that the Borough was not a party to them, and that Council members were unaware of the existence of these covenants prior to the hearing in this case.  Moreover, as the testimony cited above indicates, Plaintiffs themselves can only speculate that the restrictive covenants might apply to Scores, given that the plain language of the covenants does not appear to preclude their business from opening in the WDD zone.

Plaintiffs argue that restrictive covenants are "enforced by the third branch of government, the courts."  (Docket No. 36 at 41.)  They have not explained the relevancy of this statement.  This case does not concern the issue of whether the acts of private individuals will be deemed to constitute "state action" for purposes of the Fourteenth Amendment.  Rather, the issue is whether the Borough of Homestead allowed for reasonable alternative avenues of

46

communication when it enacted ordinances directing all adult use to the WDD zoning district. Because the evidence is uncontroverted that the first such ordinance was enacted prior to the recording of restrictive covenants excluding some adult uses from the WDD and that the Council members were unaware of the existence of these covenants, and because it is not even certain that such covenants would apply to Scores, Plaintiffs have failed to demonstrate that Defendant did not allow for reasonable alternatives.

       <u>Conditional Use Aspects of Adult Entertainment Ordinances</u>

       Plaintiffs contend that Homestead's designation of adult use as "conditional" in the WDD zone allowed for applications to be denied at the Borough's discretion and contained "illusory time limits."  Defendant argues that Plaintiffs lack standing to challenge the conditional use requirements of the WDD zoning district, because they have never indicated any intention of locating their business there.  Moreover, Defendant notes that the enactment of Ordinance No. 1196 has rendered this issue moot because it designates adult use as permitted, rather than conditional, in the WDD zoning district.  Finally, they note that the conditional use requirements could be severed from the other adult use requirements if they are deemed to be unconstitutional. Plaintiffs have not responded to these arguments.

       At the hearing, Plaintiffs' expert, R. Bruce McLaughlin, reviewed the conditional use requirements in Homestead and expressed the opinion that these requirements do not contain adequate procedural safeguards and have "illusory time limits."  (Hr'g Day 1 at 74.)  He further testified that the conditional use requirements in his opinion do not limit the discretion of the decisionmaker in deciding whether or not the requirements/criteria are met to obtain a

conditional use permit because they refer to whether the use will significantly impact "public safety."  (Hr'g Day 1 at 75-76.)

Defendant did not present testimony about this issue at the hearing.  However, Ordinance No. 1196 eliminates the conditional use requirement for adult businesses and makes them a permitted use in the WDD zone.  (Def.'s Ex. U § 9.)

Plaintiffs lack standing to challenge the conditional use requirements of the WDD zoning district because they have never indicated an intent to locate Scores there.  See Brandywine, 359 F.3d at 835 (plaintiffs could raise challenges to city's ban on adult bookstores in the B-3 zone in which their adult bookstores were located, but not the I-2 zoning district where they were not located and in which they would have been allowed to submit an application to be a conditional use).

In addition, any such challenge has been rendered moot by the enactment of Ordinance No. 1196, which makes adult use permitted in the WDD zoning district.  Id. at 835-36 (plaintiffs' request for injunctive and declaratory relief relating to ban on adult bookstores in B-3 zones rendered moot by city's enactment of amended ordinance making adult bookstores permitted uses in I-2 zones).

Overbroad Nature of Ordinances

Plaintiffs contend that Ordinance No. 1185 is overbroad because it would prohibit mainstream theatrical performances involving nudity.  Defendant responds that Ordinance No. 1196 clarifies that a "adult live entertainment facility" is one that regularly features nude or semi-nude performers and that even Ordinance No. 1185 uses the terminology "featuring or including

48

sexually-oriented live entertainment," both of which are subject to a limiting construction such that they only apply to adult entertainment and not mainstream theatrical performances.

"Pursuant to the overbreadth doctrine, a party may 'challenge a statute on its face because it also threatens others not before the court – those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" Giovani Carandola, Ltd. v. Fox, 470 F.3d 1074, 1081 (4th Cir. 2006) (quoting Board of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987)).

In this case, Plaintiffs do raise an overbreadth challenge to adult businesses in the WDD zoning district.  Therefore, they have standing to make this argument.

The Supreme Court has held that "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications...." New York v. Ferber, 458 U.S. 747, 771 (1982).  If the challenge succeeds, any enforcement of the law is "totally forbidden." The Supreme Court therefore has cautioned that the doctrine "is, manifestly, strong medicine" and should be used "sparingly and only as a last resort" and that a court should invoke a "limiting construction" or employ "partial invalidation" before resorting to finding a law facially overbroad.  Broaderick v. Oklahoma, 413 U.S. 601, 613 (1973).

Defendant also argues that the enactment of Ordinance No. 1196 moots Plaintiffs' contention that Ordinance No. 1185 is overbroad because the new enactment changes the definition of "adult live entertainment facility" as follows:

> ADULT LIVE ENTERTAINMENT FACILITY–A nightclub, bar, tavern, restaurant, bottle club, or similar commercial establishment, whether or not alcoholic beverages are served, regularly featuring (i.e. giving special prominence to) persons who are nude or semi-nude.

49

(Def.'s Ex. U § 2.)

Other courts have found this language sufficient to sustain a nudity ordinance against a challenge for overbreadth.  See Schultz v. City of Cumberland, 228 F.3d 831, 849-50 (7th Cir. 2000) (construing "regularly features" to mean a venue that features nudity or semi-nudity as the permanent focus of its business and gives special prominence to such content on a permanent basis; thus the ordinance applies to adult entertainment establishments which always feature nude or semi-nude performers and not theatrical venues that present shows such as *Hair* or *Equus* – which contain nudity – for long stretches but not on a permanent basis); Gold Diggers LLC v. Town of Berlin, Conn., 469 F. Supp. 2d 43, 61 (D. Conn. 2007) (same).

Ordinance No. 1196 is subject to a limiting construction such that it applies only to adult entertainment establishments that always feature nude or semi-nude performers and not mainstream theatrical performances that contain nudity.  The same reasoning would apply to Ordinance No. 1185.  Therefore, Plaintiffs' challenge to these ordinances as overbroad is rejected.

<u>Physical Proximity Aspects</u>

Plaintiffs introduced testimony at the hearing challenging the "proximity aspects" of Ordinance No. 1184, namely a section stating that no live entertainment facility "shall allow any physical contact between entertainers and patrons and entertainers shall be at lease [sic] six (6) feet away from patrons at all times."  (Def.'s Ex. T § 260-30(A)(14).)  At the hearing, Plaintiffs presented Dr. Judith Hanna, an anthropologist who studies dance, and who has a specialization in "adult entertainment exotic dance."  (Hr'g Day 1 at 136-377.)  She testified that, by prohibiting direct tipping and imposing a six-foot distance requirement between dancer and patron at all

times, "this would essentially ban adult entertainment exotic dance, silence free speech rights, suppress dance communication, deprive dancers of artistic choice, impose prior restraint, deprive patrons of entertainment choice, and stigmatize women." (Hr'g Day 1 at 141, 148-49.)  She also explained that the ordinance was vague in proscribing simulated sex which could be as innocuous as touching, or "booty" dancing teenagers engage in.  Dr. Hanna testified as to the effect proximity has on being able to express eroticism, trust, support, friendliness and concern. In her opinion, the ordinance was a restraint on free speech.  (Hr'g Day 1 at 149-53, 156-57.)

Defendant argues that such arguments have been rejected by numerous courts.  In Fantasy Ranch, the court rejected the argument, presented through Dr. Hanna, that an ordinance was an improper restraint because it enacted a "complete ban on proximate nude dancing," referring to the Supreme Court's comment in Pap's A.M. that "to define what is being banned as the 'message' is to assume the conclusion....  Any effect on the overall expression is de minimis." 459 F.3d at 562 (quoting Pap's A.M., 529 U.S. at 293).  See also Colacurcio v. City of Kent, 163 F.3d 545, 555-57 (9th Cir. 1998) (rejecting Dr. Hanna's testimony challenging a ten-foot buffer zone, a two-foot stage height requirement and a tipping ban, concluding that these measures were narrowly tailored).

To the extent that Plaintiffs intend to challenge[12] the proximity provision of Ordinance No. 1184, this challenge is rejected for the reasons cited by the courts in Fantasy Ranch and Colacurcio: "proximate nude dancing" is not protected activity under the First Amendment and bans on tipping and direct contact between dancers and patrons are measures narrowly tailored to achieve their goals of combating negative secondary effects.

---

[12]Plaintiffs have not presented any argument concerning this issue in their briefs.

<u>Conclusion</u>

Plaintiffs have failed to demonstrate a likelihood of success on the merits of their First Amendment claim because Ordinance Nos. 1184 and 1185 were enacted to further the Borough's interest in combating negative secondary effects, because they allowed for adequate alternatives (even assuming that the enactment of Ordinance No. 1196 has not rendered the issue of adequate alternatives moot) and because the existence of privately-agreed upon restrictive covenants of which Borough Council was unaware and which may not even apply to Plaintiffs' business does not alter this conclusion. The Court need not address the additional factors of irreparable harm, weighing of the harms and the public interest.  Plaintiffs' challenges to the conditional use aspect of the ordinances and to their alleged overbreadth have been rendered moot by the enactment of Ordinance No. 1196.

An appropriate order shall be entered.


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge


Dated: October 4, 2007